Sharon ALTER, Sue Patterson, Rex Fansler, on behalf of themselves and others similarly situated, Plaintiffs,

v.

SCM OFFICE SUPPLIES, INC. and Ampad Corporation, Defendants.

Civ. No. 1:95cv7.

United States District Court, N.D. Indiana, Fort Wayne Division.

Nov. 30, 1995.

---

Michael T. Yates, Moss Crowell Harris Yates and Long, Fort Wayne, IN, Michael Bonnell, Bloomington, IN, for Sharon Alter, Sue Patterson, Rex Fansler, on behalf of themselves and others similarly situated, John Randall Johnson.

Steven V. Shoup, Jan J. Kinzie, Owen Shoup and Kinzie, Indianapolis, IN, Michael A. Kalish, Winthrop Stimson Putnam and Roberts, New York City, for SCM Office Supplies.

Gary D. Johnson, Steven L. Jackson, Michael L. James, Baker and Daniels, Fort Wayne, IN, Allan L. Bioff, Sharon D. Hess, Bioff Singer and Finucane, Kansas City, MO, for Ampad Corporation.

### ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on cross-motions for summary judgment. Defendant, Ampad Corporation ("Ampad"), filed its motion for summary judgment on May 19, 1995. The plaintiffs filed their motion for summary judgment on August 11, 1995. The parties completed briefing the motions on August 28, 1995. On August 3, 1995, this court granted the plaintiffs an extension of time to file a motion to certify this action as a class action, and the parties stipulated that rulings on the motions for summary judgment should not be made prior to certification of the class. On November 16, 1995, this court entered an order certifying this cause as a class action, and the motions for summary judgment then became ripe for consideration.

#### Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id. In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)).

■ Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

■ So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. *See, Waldridge v. American Hoechst Corp. et al.,* 24 F.3d 918 (7th Cir.1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

■ Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th

Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

### Discussion

This action was brought against Ampad and co-defendant SCM Office Supplies, Inc. ("SCM")[1], pursuant to the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq.*

On July 5, 1994, Ampad purchased certain of SCM's assets, including SCM's Marion, Indiana manufacturing plant where plaintiffs were employed. Plaintiffs allege that SCM and Ampad violated the WARN Act by failing to provide plaintiffs with a 60–day notice of a "plant closing" or "mass layoff" which plaintiffs alleged occurred on the date Ampad purchased the Marion facility.

The WARN Act requires that an employer give 60 days advance warning prior to any "plant closing" or "mass layoff." A "plant closing" is a temporary or permanent shutdown of a single site of employment that causes an "employment loss" for fifty or more employees during a thirty-day period. 29 U.S.C. § 2101(a)(2). A "mass layoff" is any other "employment loss" within any thirty-day period for either (a) 50 to 499 full-time employees, if the number laid off equals 33% of the work force; or (b) 500 full-time employees. 29 U.S.C. § 2101(a)(3). Thus, when fewer than fifty full-time employees suffer an "employment loss," a WARN Act notice is not required.

An "employment loss" is defined in 29 U.S.C. § 2101(a)(6) as:

> (a) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (b) a layoff exceeding 6 months, or (c) a reduction in hours of work of more than 50 percent during each month of any 6–month period[.]

The word "termination" is "to have [its] common sense meaning" as "the permanent cessation of the employment relationship. . . ." 54 Fed.Reg. 16,047 (1989).

Additionally, § 2101(b)(1) provides that:

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of sale. After the effective date of sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title. Notwithstanding any other provision of this chapter, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of sale.

In a memorandum dated July 5, 1994, addressed to "All Employees" at the Marion facility, SCM stated as follows:

> As was announced previously, the assets of SCM Office Supplies, Inc. are being sold to Ampad Corporation.

> Therefore, as of 3:00 p.m. today, Tuesday, July 5, 1994, your employment with SCM Office Supplies, Inc. will end. Health insurance with Blue Cross Blue Shield of Indiana will continue through the end of the week unless you are covered prior to that time by Ampad Corporation.

> Ampad Management will conduct a meeting of all employees at 3:00 p.m. today (Tuesday) in the Finished Goods Warehouse. Attendance at this meeting is voluntary for all shifts.

---

1. SCM is in bankruptcy in the United States Bankruptcy Court in Delaware. Thus, all proceedings against SCM in this court have been stayed. On October 20, 1995, Ampad notified this court that it had no objection to this cause proceeding as to Ampad alone.

At or shortly after 3:00 p.m. on July 5, 1994, Ampad's President, Russell M. Gard, held the meeting referred to in SCM's memorandum. At this meeting, Ampad distributed to those former SCM employees who attended the meeting a letter dated July 5, 1994 and addressed to "All SCM Office Supplies, Inc. Production and Maintenance Employees" in which Ampad stated, in part, as follows:

As you know, SCM Office Supplies, Inc. has been purchased by AMPAD Corporation. The purchase was completed today. AMPAD is delighted to be the new owner of the Marion facility and to become a corporate citizen of the Marion community. In a change in ownership like this one, those who work at the acquired facility are understandably concerned about jobs. The purpose of this letter is to inform you how you may go about applying for a job with AMPAD.

AMPAD will interview and consider for employment SCM employees who wish to come to work for AMPAD and who make written application for employment. Employment interviews of interested SCM hourly paid production and maintenance employees will be conducted at the plant today and will continue tomorrow.

\* \* \* \* \* \*

Included with this letter is an AMPAD employment application.

\* \* \* \* \* \*

SCM employees who wish to apply for employment with AMPAD should complete the attached AMPAD application and bring it to the employment interview. As indicated in the application, employment by AMPAD is contingent upon the applicant's successfully passing a drug screening analysis for substance abuse.

Commencing at approximately 4:00 p.m. on Tuesday, July 5, 1994, and continuing on Wednesday, July 6, Ampad took applications from and conducted employment interviews of hourly paid former SCM employees. On or before Friday, July 8, Ampad made employment offers to and received acceptances from 249 or 77% of the 323 former SCM employees. After July 8, Ampad continued to take applications from and interview for-mer SCM employees. After July 8, Ampad made employment offers to and received acceptances from 14 additional former SCM employees

Ampad has taken the position that there was no "mass layoff" or "plant closing" within the meaning of § 2101(a)(3) and § 2101(a)(2) after the effective date of the sale and thus Ampad, as the purchaser, had no responsibility under § 2101(b)(1) to provide notice of a "mass layoff" or "plant closing" as set forth in § 2102.

The plaintiffs, however, contend that a "plant closing" occurred on July 5, 1994, and that all 262 hourly employees suffered an employment loss, including the 217 employees who were hired by Ampad, most of them within one or two days following the sale. According to plaintiffs, the 217 SCM hourly employees hired by Ampad were "terminated" by Ampad on the date of sale and their "termination" lasted until they commenced working for Ampad, a day or two later.

Ampad argues that the plaintiffs' contentions are not supported by the provisions of the WARN Act or the WARN Act regulations but are, rather, in direct conflict with the Act and the regulations. Under the Act, an "employment loss" is defined to include an "employment termination" or a "layoff exceeding 6 months." Ampad points out that the Department of Labor has explained that the word "termination" means "the permanent cessation of the employment relationship." 54 Fed.Reg. 16047 (1989).

As Ampad further points out, there was no actual "employment relationship" between Ampad and the SCM hourly employees on July 5 from which the SCM employees could either be "terminated" or "laid-off". SCM terminated all of its Marion facility employees on July 5 as a consequence of the sale. The terminated SCM hourly employees thus became unemployed persons with no "employment relationship" on July 5 with either SCM or Ampad. However, for purposes of the WARN Act, the SCM employees terminated by SCM on July 5 became Ampad's employees on that date pursuant to § 2101(b)(1). It is this fictional § 2101(b)(1) "employment relationship" that plaintiffs

contend was "terminated" by Ampad on July 5.

With this in mind, Ampad argues that because the former SCM employees were not actually Ampad's employees on July 5, the question of whether they were "terminated" by Ampad from their § 2101(b)(1) employment on July 5 must be determined by analogizing the "employment loss" definitions in § 2101(a)(6) and the related Department of Labor regulations. Thus, according to Ampad, the question is whether the interruption in employment experienced by the 217 former SCM hourly employees between July 5 and the date they were hired by Ampad is analogous to an "employment termination" or is analogous to a temporary "layoff" as those terms are used in the statute and regulations. Ampad submits that the interruption in employment was clearly a "temporary cessation" and not a "permanent cessation" of the fictional § 2101(b)(1) employment relationship. Thus, Ampad argues that the former SCM employees were simply "laid-off" and not "terminated", and since the "lay-off" did not exceed six months, they did not experience an "employment loss".

Plaintiffs have also alleged that a "plant closing" occurred on July 5, 1994, because more than 50 prior SCM employees were not hired by Ampad after the sale, thereby suffering an "employment loss". Ampad has submitted a three-pronged argument in response to the plaintiffs' allegations. First, Ampad argues that the words "temporary shutdown" as used in § 2101(a)(2) should not be construed as encompassing brief interruptions of business operations required to accommodate a transfer of the business from a seller to a buyer. Secondly, Ampad argues that the two day temporary shutdown did not constitute a "plant closing" because the shut down did not "result in" the employment losses. Rather, Ampad argues, the employment losses were caused by other factors. Stated another way, Ampad argues that there was no "plant closing" as defined in § 2101(a)(2) because the two-day temporary shutdown of the Marion facility had nothing whatever to do with the employment losses

of the former SCM employees not hired by Ampad.

For its third argument, Ampad submits that there was no "plant closing" because there were fewer than 50 "employment losses". Ampad has conceded that 43 employment losses occurred. Plaintiffs, however, claim that there were 26 other employment losses. These 26 alleged employment losses fall into three categories: (1) 15 are former SCM employees who were full-time SCM employees on July 5 but who were not hired by Ampad; (2) six are SCM "temporary" or "probationary" employees terminated by SCM in April and May 1994 who plaintiffs contend should have been laid-off rather than terminated by SCM; and (3) five are former SCM employees who, after they were hired by Ampad, were terminated by Ampad, four because they failed a drug test and one because Ampad closed his job.

With respect to the first category above, the record is clear that of the 15 employees mentioned, 13 did not apply for employment with Ampad, one (Deborah Berryman) applied for employment but was unavailable for work due to disability, and one applied for employment but refused to take the pre-employment drug test. Plaintiffs have submitted the affidavit of John Randall Johnson, an employee of the Indiana Department of Workforce Development, and a prior Ampad employee. Johnson has stated in his affidavit that four of the 13 persons who did not apply for employment were not allowed to apply and that Berryman was available for work within a week or two after applying for work with Ampad[2]. Ampad correctly points out that Johnson's statements are hearsay statements that would not be admissible at trial, and are thus insufficient to defeat a summary judgment motion. Moreover, Johnson's statements are conclusory and are not supported by any details or concrete information.

The plaintiffs also argue that the former SCM employees who did not apply to Ampad for employment had no legal obligation to apply for employment because, under § 2101(b)(1), they became Ampad's employ-

---

2. Johnson Aff. at ¶ 21.

ees for WARN Act purposes on the date of the sale. In response to this argument, Ampad claims that the employees who failed to apply for employment became, by analogy, "voluntary departures" from their § 2101(b)(1) employment with Ampad. Ampad further asserts that the former SCM employees who declined to apply and be considered for employment did not experience an "employment loss" because of a "plant closing" or "mass layoff" but, rather, caused their own loss of employment.

Plaintiffs also argue that because SCM terminated, rather than laid-off, six "temporary" or "probationary" employees, that the six terminations, which occurred within 90 days of the sale, should be counted as "employment losses" attributable to Ampad. Ampad points out that even if the six employees had been laid-off and not hired by Ampad, they would not have been counted as "employment losses" for purposes of determining whether there was a "plant closing" within the meaning of § 2101(a)(2). All six of the "temporary employees" were hired by SCM in April 1994 and, therefore, were "part-time" employees as defined in § 2101(a)(8)[3]. Part-time employees are expressly excluded from the definitions of "plant closing" and "mass layoff" in § 2101(a)(2) and (3). Moreover, the WARN Act regulations are explicit that, while part-time employees are entitled to receive WARN Act notice of plant closings and mass layoffs, they "are not counted in determining whether plant closing or mass layoff thresholds are reached." 20 CFR § 639.6(b).

With respect to the four[4] former SCM employees hired by Ampad, who were terminated for cause when Ampad received the results of their pre-employment drug tests, Ampad simply asserts that since they were discharged for cause, they did not suffer an "employment loss".

■ After carefully considering the parties' positions, this court finds it appropriate to grant summary judgment in Ampad's favor as there are no genuine issues of material fact present in this case. First, the court finds that, with respect to the 217 employees hired by Ampad shortly after the sale (and who lost a few days of employment while Ampad was conducting interviews), these employees did not suffer an "employment loss" as defined in the WARN Act. As a matter of law, these 217 employees did not suffer an "employment termination" (*i.e.* a permanent cessation of the employment relationship), nor did they suffer a "layoff exceeding 6 months." *See* § 2101(a)(6); Fed. Reg. 16,047 (1989).

■ Next, the court finds that there was no "plant closing", nor a "mass layoff" because there were fewer than 50 "employment losses". With respect to the 15 employees that were not hired by Ampad, the record clearly shows that 13 of these employees did not apply for employment, making their employment loss voluntary. Likewise, the employee who refused to take the drug test voluntarily declined employment with Ampad. Finally, with respect to the disabled employee, Deborah Berryman, there is no admissible evidence before the court indicating that she was able to work. Although plaintiffs have claimed that four employees on medical leave were not allowed to apply for a job (*see* Johnson Aff. at ¶ 20), this claim is not supported by admissible evidence.

■ Next, the court finds that the six temporary employees who were not hired by Ampad do not count as "employment losses" because, as "part-time" employees, they are to be excluded. *See* § 2101(a)(2), (3), (8); 20 CFR 639.6(b).

■ Finally, with respect to the four employees who failed their pre-employment drug tests, and were thus terminated by Ampad, the court finds that these four employees were discharged for cause and, as a

---

**3.** Section 2101(a)(8) states that:
[T]he term "part-time employee" means an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required.

**4.** Ampad has conceded that the fifth employee, David Bellinski, who was hired and then terminated by Ampad when Ampad closed his job, is an employment loss.

matter of law, do not count as "employment losses."

Thus, it is clear that as a matter of law, 50 or more "employment losses" did not occur. Consequently, the plaintiffs' claims fail as neither a "plant closing" nor a "mass layoff", as defined in the WARN Act, occurred. Accordingly, summary judgment will be granted in favor of Ampad, and the plaintiffs' motion for summary judgment will be denied.

### Conclusion

For all of the foregoing reasons, Ampad's motion for summary judgment is hereby GRANTED, and the plaintiffs' motion for summary judgment is hereby DENIED.